[Crim. No. 304. Second Appellate District.—January 23, 1914.]

THE PEOPLE, Respondent, v. LEE RIAL, Appellant.

CRIMINAL LAW—LARCENY AND OBTAINING MONEY BY FALSE PRETENSES DISTINGUISHED.—In larceny there is no parting with the title to the thing taken, nor intent to part with it, while in false pretenses the person defrauded intends that title shall be divested, but his consent is obtained by fraud.

ID.—CONFIDENCE GAME—FAKE RACES—OBTAINING MONEY TO BET.— Where confidence men fit up a fake pool room and there accept money, a draft and a certificate of deposit from a victim, he intending that it shall be bet on races, and they intending to deprive him of it, without making any *bona fide* bets, the offense is larceny rather than obtaining money under false pretenses.

ID.—INTENT OF OWNER OF PROPERTY—EVIDENCE.—The writing contained in and the indorsements made upon the draft and certificate of deposit do not constitute the only evidence from which the intent of the owner should be ascertained.

ID.—APPROPRIATION OF MONEY TO SOME USE—WHETHER NECESSARY TO COMPLETION OF CRIME.—In establishing the commission of the crime, it is not necessary that it should be shown that the property taken was applied to some use by the defendant or his confederates. When possession of the property was obtained through the fraudulent means employed and with intent to deprive the owner thereof, the crime was complete; and the fact that the complaining witness stopped payment on the certificate of deposit after delivery, did not make the act of obtaining possession thereof any the less criminal.

ID.—CORROBORATIVE PROOF—NECESSITY.—The prosecution for such offense being one for larceny, it is not necessary that corroborative proof of the kind indicated by the provisions of section 1110 of the Penal Code should be furnished.

ID.—OTHER SIMILAR OFFENSES—ADMISSIBILITY OF EVIDENCE.—In such prosecution evidence which tends to show that the defendant has, at prior times, engaged in practices similar to the offense complained of, is properly admitted.

ID.—SECONDARY EVIDENCE—PAROL TO SHOW CONTENTS OF DRAFT AND CERTIFICATE OF DEPOSIT.—On the trial for such offense the prosecution need not demand of the defendant the production of the draft and certificate of deposit before offering parol evidence of their contents.

ID.—DEMAND OF DEFENDANT TO PRODUCE DOCUMENTS—ERROR INVITED.— If the defendant objects to such testimony as secondary and incompetent, and thereby prompts the district attorney to demand that the defendant produce the documents, the defendant is not in a position to claim prejudice on account of such demand.

ID.—SCOPE OF EVIDENCE—WHETHER CIRCUMSCRIBED BY OPENING STATEMENT.—The limit of evidence material to sustain the charge was not circumscribed by the opening statement of the district attorney, especially where the defendant could not have been misled to his prejudice as to the scope of the evidence designed to be produced against him.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order refusing a new trial. Frank G. Finlayson, Judge.

The facts are stated in the opinion of the court.

H. H. Appel, and G. R. Horton, for Appellant.

U. S. Webb, Attorney-General, and George Beebe, Deputy Attorney-General, for Respondent.

JAMES, J.—Appellant was charged with having committed the crime of grand larceny. He was convicted and appeals from the judgment entered against him, and from an order denying his motion for a new trial.

It was particularly charged in the information that appellant, on the eighteenth day of February, 1913, in the county of Los Angeles, feloniously stole and carried away forty dollars in money, one draft drawn by the First National Bank of Mascuotah, Illinois, for one hundred dollars, and one certificate of deposit of the First National Bank of the city of Los Angeles for the sum of five thousand dollars, all of which property was alleged to be of the aggregate value of $5,140. By the evidence it was shown that the complainant was a resident of Illinois and that he came to the city of Los Angeles on a pleasure trip; that at one of the depots he met a man who called himself Reed and with whom he had some friendly converse thereafter; that Reed invited complainant to go to Venice, a seaside town in Los Angeles County, and that while there Reed pretended to recognize a man whom they met on the sands, as a person whom he had seen in the East and who he said had won large sums of money on the races at Minneapolis; that Reed sought to introduce himself to this man, who at first denied that he was the person referred to, but who finally admitted his identity, and the two men chatted for some time about matters of which they claimed to have common knowledge with reference to the city of Minneapolis. Reed requested this man to give to him and complainant the benefit of his knowledge of racing matters and asked him to bet some money for them. The man at first demurred, but finally accepted a small sum from each and together they journeyed to a side street and to a set of rooms upstairs in a building, where there appeared to be a complete betting exchange. There were telegraph instruments in the room which were in operation, or appeared to be so; a blackboard was hung upon the walls with the usual marked spaces for the entering of names of horses and the order in which they ran in the races; and there was a telephone instrument with receivers, which one of the men in the place would use whenever a "race" was to be called. At the insistence of Reed, defendant placed several bets with a man behind the counter, all of which invariably were suc-

cessful. Finally, after the complainant had placed with the man who acted as bookmaker all of the property described in the information, a last bet was made by which all of the winnings were declared to have been swept away. Before this bet was made, a large sum of money was due from the bookmaker to the three men, presumably. They held the race checks ready to "cash in" as soon as the cashier was ready to make payment, which he represented that he would be within a short while. It was then proposed by one of the men other than complainant that another bet be made, but they had no money with which to make it. It was suggested then by Reed or appellant that they could use the checks which they held as cash, and these they did use. The appellant was the man who was supposed to have the inside information on the races, which he pretended to have received through telegrams from the East. He designated what horse should be bet upon for the next race and Reed took the checks to the bookmaker for the purpose of placing the bet. He soon returned where complainant and appellant were, in the room adjoining, and exhibited his ticket. Appellant appeared to be much disturbed when he saw the ticket, saying to Reed that he told him to play the horse for second, and that instead of doing that he had played him for first place. Appellant then went into the pool room for the purpose, as he stated, of changing the bet, but the man at the counter declared that the bets could not then be changed, as the horses were ready to run. The report of the race was soon declared by the man at the telephone, who stated that the horse upon which the men had placed their bet had come in second. Thereupon appellant acted in a hysterical manner, berated Reed violently and struck him over the head; whereupon Reed ran out of the building and away, and at the time of the trial had not again appeared. Complainant being without money cashed a check with the bookmaker, receiving one hundred and ten dollars, and came back to the city with appellant. Appellant urged the complainant to go to Chicago with him that night, to which complainant agreed, and he met appellant at the time and place designated by the latter. At the moment the two men there met, police officers arrived and arrested appellant. A visit to the pool room at Venice disclosed that all of the sporting

paraphernalia had been removed, and also the men connected therewith had betaken themselves off. Evidence was introduced showing that the telephone and telegraph instruments used in the rooms had not been connected with the wires of telephone or telegraph companies, and in fact there was evidence sufficient to warrant the jury in determining that the entire transaction was in furtherance of a scheme devised for the purpose of defrauding credulous persons who could be drawn into the net set for them. The evidence was also sufficient in a circumstantial way to show that Reed and appellant, together with the other persons concerned in the operation of the pretended pool room, acted in concert and pursuant to an understanding had between them.

That the proof showed this to be a case, not of larceny, but of obtaining money by false pretenses, is a proposition which is made the subject of much serious argument in the briefs of appellant. In larceny there is no parting with the title to the thing taken, nor intent to part with it. In false pretenses the person defrauded intends that title shall be divested, but his consent is obtained by fraud. (Bishop's Criminal Law, vol. 2, sec. 808; *People* v. *Delbos,* 146 Cal. 734, [81 Pac. 131].) Taking the facts of this case as the evidence showed them to be: The complaining witnesses delivered his money and other property to defendant and his confederates for the purpose of having it bet upon a horse race. The scenery of a complete stage of fraud was set up: There was what appeared to be a real pool room in operation; the newly-found friends were not what they pretended to be; the pool room setting was "faked" and no returns from *bona fide* horse races were received there. Consequently the complaining witness, although he intended to bet his money upon horse races, never did in fact so wager it. He may have intended that his property should abide the hazard of the races, but the conditions under which he intended in that event to part with his property were not present. Therefore, it cannot be said that he parted with both the possession and title to his property when he intrusted it to the charge of a confidence operator. The decision in the case of *Miller* v. *Commonwealth,* 78 Ky. 15, [39 Am. Rep. 194], rested upon facts of a kind similar to those which the evidence illustrates here, and what is there said is particularly

applicable to this case. Quoting from the opinion: "The money was delivered to Smith to be bet for the prosecutor, and there was certainly no intention on his part to give up the money until it should be lost on the game. Until that occurred, he continued to be the owner of the money and might have demanded its return. He had not loaned it to Smith or advanced it to him upon any contract, express or implied, by which Smith became his debtor. The money was in Smith's hands as a mere custodian or agent for the prosecutor. It continued to be the prosecutor's money. It was handed to Smith to be bet for him, and not for the use or benefit of Smith in any way. He no more parted with his property in the money than if instead of going to a faro bank and handing Smith the money to bet for him on the game, they had gone into an auction-room and he had handed the money to Smith to make purchases for him. In this latter case no one will doubt but that if the money had been obtained for the ostensible purpose supposed, but with the actual felonious intention not to use it for that purpose, but to convert it to his own use, he would have been guilty of larceny. (2 Russell on Crimes, 42 et seq.) If it was not the intention of the prosecutor when he handed the bills to Smith, to part with his property in them, but merely to part with the possession for the purpose of having them betted on the game, and Smith received them, not for the purpose of betting *bona fide,* but with the intent to lose them on a fraudulent game concerted between himself and Miller, or between themselves and others, and did so bet and lose the money, Smith was guilty of larceny; and if Miller knew that Smith had obtained the money from the prosecutor to bet against the bank, and by preconcert between himself and Smith, Smith knew which cards would lose and which would win, and it had been agreed that he should bet on those they knew would lose, and this was done with the design to deprive the prosecutor of his money, and he was so deprived of it, Miller is also guilty." To the same effect: *Stinson* v. *People,* 43 Ill. 397; *People* v. *Shaw,* 57 Mich. 403, [58 Am. Rep. 372, 24 N. W. 121].

The writing contained in and the indorsements made upon the draft and the certificate of deposit did not constitute the only evidence from which the intent of the owner of

that property should be ascertained. As to the circumstances under which possession was parted with—the proof of the fraud necessarily rested almost wholly in parol. The prosecution being one for larceny, it was not necessary that corroborative proof of the kind indicated by the provisions of section 1110 of the Penal Code should have been furnished. The evidence which tended to show that defendant had engaged in practices similar to that complained of, at prior times, was properly admitted. (*People* v. *Arnold,* 17 Cal. App. 68, [118 Pac. 729].) The effect of this evidence was carefully limited by the instructions of the trial judge to the jury.

It was not necessary that it should be shown that the property taken was applied to some use by the defendant or his confederates before the crime was made out. When defendant obtained possession of the property of the complainant through the fraudulent means employed and with intent to deprive the owner thereof, the crime was complete; as much so as had he snatched it from the person of complainant and starting to run away was caught and the property taken back. The draft and certificate of deposit at the time they passed into the defendant's possession were valid and their value was the sum that might have been collected thereon, as is provided by section 492 of the Penal Code. The fact that complainant stopped payment on the five thousand dollar certificate of deposit after delivery, did not make the act of defendant in obtaining possession thereof any the less criminal. Furthermore, it appears that the draft for the sum of one hundred dollars was carried away and payment on it was not stopped. The securing of the latter paper alone in the manner charged was sufficient to make out the crime.

. Parol evidence was allowed for the purpose of proving the contents of the five thousand dollar certificate of deposit. This document was delivered to the man behind the desk at the "pool room." Having passed into the possession of the accomplice of defendant, as the jury had the right to conclude it had, the prosecution was not required to demand of defendant its production before offering parol evidence as to its contents. This proposition is fully sustained by all of the authorities. At one point in the course of the trial the district attorney made demand that the defendant

produce the one hundred dollar draft which it was claimed the complaining witness had delivered to him. This demand was prompted by the fact that appellant had objected to questions asked by the prosecutor of the complaining witness touching the contents of the draft, appellant's claim in that regard being that it was improper to allow oral proof to be made of the contents of a written document. The district attorney then stated that he demanded of defendant the production of the draft. Counsel for appellant then objected to the demand, the grounds of his objection as stated by him being that the district attorney had not, in his opening statement, claimed that appellant had ever had possession of the moneys or the draft mentioned in the information, concluding his objection with these words: "And I assign his conduct in so doing as error, and as having been done purposely for effect." Proof was made that the draft in question had been delivered to appellant, and that he had in turn delivered it to the pretended bookmaker. When these facts appeared it was the prosecutor's privilege to make proof of the contents of the draft by parol without demanding that appellant produce the document, but his demand in that regard was prompted by the objection of counsel that such evidence would be secondary and incompetent. Under this state of the record appellant is not in a position to claim prejudice, for it was by reason of his own objections that the prosecutor was led to make the demand complained of. This case is different in its facts from the case of *Gillespie* v. *State*, 5 Okl. Cr. 546, [Ann. Cas. 1912D, 259, 115 Pac. 620], cited by appellant. A further observation may be made on this question: It will be noted that appellant's only ground of objection to the demand of the district attorney was that the prosecutor in his opening statement had not claimed that the draft had gone into the possession of appellant. The limit of evidence material to sustain the charge was not circumscribed by the opening statement of the district attorney, especially where appellant could not have been misled to his prejudice as to the scope of the evidence designed to be produced against him. At the time the objection mentioned was made the trial had only fairly commenced, with complainant as the first witness on the stand under examination. The trial judge was not guilty

of prejudicial misconduct. His attitude, as it is represented in the record, was one which showed a scrupulous appreciation of the duties of a judge as distinguished from those of the jury.

A number of other errors are assigned, many relating to the admission of evidence, the giving and refusing to give certain instructions to the jury. These have all been carefully examined and considered. In the view that is taken of them, they do not demand extended or detailed discussion. As a whole, the instructions given to the jury seem to cover the case fully and to declare the law correctly. The instructions, when read together, present no state of misleading conflict. In some particulars they seem to be more favorable to the defendant than he was entitled to expect or demand.

The judgment and order are affirmed.

Conrey, P. J., and Shaw, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on February 21, 1914, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal was denied by the supreme court on March 23, 1914.