[Crim. No. 768. Second Appellate District, Division One.—May 6, 1921.]

## THE PEOPLE, Respondent, v. WILLIAM W. DEAN, Appellant.

[1] CRIMINAL LAW—OBTAINING OF MONEY BY FALSE PRETENSES—SUFFICIENCY OF EVIDENCE.—In this prosecution under an indictment charging the defendant with having feloniously stolen and carried away money, the evidence shows that the complaining witness never parted with title to the money or made a loan thereof to defendant.

[2] ID.—EVIDENCE—PARTING WITH TITLE—HARMLESS ERROR. — Where in a prosecution for obtaining money by false pretenses it clearly appeared from the uncontradicted evidence that the complaining witness did not part with the title to the money, but was induced to part with the money by trickery of confidence operators, it was not prejudicial error to permit her to answer the question as to whether she at any time parted with the title.

APPEAL from a judgment of the Superior Court · of Los Angeles County and from an order denying a new trial. Frank R. Willis, Judge. Affirmed.

The facts are stated in the opinion of the court.

Clare W. Woolwine, James Hosick, Leonard M. Comegys and H. L. Giesler for Appellant.

---

1. Obtaining loan as constituting crime of obtaining money by false pretenses, note, Ann. Cas. 1916C, 1158.

U. S. Webb, Attorney-General, and Arthur Keetch, Deputy Attorney-General, for Respondent.

JAMES, J.—Appeal from a judgment of imprisonment and from an order denying to defendant a new trial. Appellant was found guilty under an indictment charging him with having feloniously stolen and carried away $30,000, lawful money of the United States and the property of Ethel L. Hupp. The evidence in the case tells the very familiar story of the credulity of a confiding victim and the baseness of a class of men who may be catalogued in general as "bunco artists." We may preface our statement of the evidence with the assertion, advisedly made, that the proof was abundant to show a determined and premeditated design, carefully planned and executed, to unlawfully deprive the complainant of a large sum of money.

Early in the year 1919 Mrs. Hupp came to Los Angeles from the city of Dallas, Texas. She was possessed of considerable means in the way of ready money. Dean was her first cousin, Dean's mother being a sister of the mother of Mrs. Hupp. Soon after arriving in Los Angeles the latter settled herself in a home. Dean made his appearance in Los Angeles shortly after Mrs. Hupp's arrival and presented himself to her, was received into the family circle and extended the hospitality of the Hupp home. Mrs. Hupp made free to discuss business matters with her cousin, and it was from her that he learned that she had sold her residence property in Dallas for the sum of $48,000 and that she had at least that much money in cash. Being established thoroughly in the confidence of Mrs. Hupp, Dean proceeded, as the evidence shows, to execute with considerable rapidity his plan to fleece his relative. To carry out this design he needed a second party; hence the appearance of a man called Dorchester upon the scene as one of the actors in the scheme of fraud. The preliminary foundation for the introduction of Dorchester was shrewdly laid. Dean one evening at the Hupp house told Mrs. Hupp that he would not accept an offer to accompany the family that evening, because he wanted to go downtown, as he had that day caught sight of a Salt Lake friend whom he very much desired to renew acquaintance

with; that he had been unable to overtake that friend
when he had observed him, so he wished to go to the large
hotel that evening and search for him. During the next
day or two Dean expressed a desire to meet Mrs. Hupp
at the automobile license bureau, where she intended to
go, and the time was fixed when he would meet her there.
Dean was on hand when Mrs. Hupp arrived at the place
designated and remained outside while she attended to
the license business. As she returned and before the two
had started away, Dean suddenly announced that his friend
was approaching, and called the man Dorchester over and
introduced him to Mrs. Hupp. The three chatted together,
Dorchester talking familiarly to Dean about the stock
market or stock transactions, and referred to a well-known
man of Salt Lake City. Mrs. Hupp testified that Dor-
chester appeared to be in a hurry, but before leaving he
inquired of Dean where he could find the latter, and Dean
gave Dorchester Mrs. Hupp's address and telephone num-
ber. On the same evening Dean was at the Hupp house
and was about to have dinner with the family and some
guests when Dorchester "dropped in." Dorchester drove
to the house in a limousine, was attired in evening clothes,
and made altogether, according to Mrs. Hupp's descrip-
tion, quite a splendid and impressive appearance. He was
still a very busy man and in much of a hurry to keep an
evening engagement, so remained but a short while. Dur-
ing the time that Dorchester spent at this appearance he
and Dean talked about stock and stock matters, from which
Mrs. Hupp became advised that Dorchester was the repre-
sentative of a stock-broking firm doing business under the
alleged name of "Sheppard and Company." She also heard
Dorchester tell Dean that he had worked at the business
for many years and had never taken anyone into his con-
fidence, intimating that he possessed some valuable infor-
mation regarding the stock market; that he was very closely
in touch, also, with the wealthy Salt Lake man. The stage
had now been well set for the climax which was arranged
to follow, and in which Mrs. Hupp evidently fulfilled all
of the expectations of the conspirators as to the manner in
which her part should be played. On the following day
Dean accompanied Mrs. Hupp downtown; Dorchester hap-
pened to meet them while they were in the automobile and

he stopped and chatted with them. The inevitable subject of Dorchester's business and investments in stocks was talked of between Dean and Dorchester, although the two were careful to avoid any suggestion to Mrs. Hupp that she use any of her means to purchase stock. It was to Dean that the valuable advice was given by Dorchester, with the intent, of course, that none of the conversation should be missed by Mrs. Hupp. Dorchester there exhibited to Dean a card which he said was an identification card admitting him to a stock exchange which was afterward referred to as the "International." The identification ticket, as observed by Mrs. Hupp, had upon it a picture of Dorchester and the latter's name and designation as representative of "Sheppard and Company." After telling Dean about some stock investment that his firm had directed be made, he allowed Dean to take the admittance ticket and go away with it, telling him that he could take it down to the stock exchange and get in on it. Dean took the card and came back in about twenty-five minutes and then Dorchester told him to go down and make a similar buy to "this," showing him a pink ticket, whereupon Dean went away on his mission to the "stock exchange" and later came back. When he returned Dorchester examined the pink ticket in Dean's hand and simulated great excitement and anger because the identification ticket was not returned. Dean told him that he had done just as Dorchester had advised; that he had left the ticket on the counter; that the man had taken it up and brought back the pink ticket; whereupon Dorchester replied, "I just gave you that ticket to go and buy; I didn't give it to you to give to the man." Thereupon Dorchester evidenced all the outward signs of great anger toward Dean, told him that he, Dorchester, was put in a bad position by involving his firm in the matter, that in order to take up the ticket he would have to get together $40,000; that that would have to be done in a hurry, as the auditor of "Sheppard and Company" (naming a well-known Los Angeles banker, who it is perhaps needless to here state was shown later to have no knowledge of Dorchester or his alleged employers) must have a report on his operations. Dorchester finally said he would wire the Salt Lake gentleman, where he was sure that he could get money, and for

them not to worry. Mrs. Hupp thereupon left the two.
Later in the day Dean came out to the house and was
greatly exercised; said that he had tried to get money
to help Dorchester; that Dorchester would lose his position
on his, Dean's, account, and altogether presented a very
excited and worried appearance. To use Mrs. Hupp's lan-
guage in describing the condition of Dean, that witness
said: "Yes, he was terribly upset. He said it would be
his fault, it was such a bone-headed trick of his doing that,
that Mr. Dorchester would lose his position, and he was
very much excited and very much worried. He said he
didn't know what Dorchester might do to him. Dorchester
might kill him. He was very much upset about what might
happen to him." Matters soon progressed to the point
where Dean asked Mrs. Hupp if she could not raise the
money to help Dorchester out. Dean at that time said
that Dorchester had only been able to raise $10,000 in Salt
Lake. Again the three met together and, according to
the testimony of Mrs. Hupp, she was told that if she could
get $30,000, "all they needed it for was to go down to this
exchange, and it wouldn't take fifteen minutes to take it
up, to take up this ticket, and he would bring it right
back to me; bring my money back, . . . and I should stay
in the car until he came back. Dorchester was sitting in
the car with him." And so it was that Mrs. Hupp went
to her bank, procured $30,000 in cash, and met Dean
and Dorchester. She gave Dean the $30,000 and Dorchester
handed to Dean what was pretended at least to be the
$10,000 to make up the $40,000. Mrs. Hupp remembered
hearing Dorchester say to Dean, which was evidently a
part of the stage play, "When you get your money, *sell*
Alaska Gold"; that Dorchester said that he would write
it down and he took out a paper and wrote something on
it and gave it to Dean; then told Dean to go through
the entrance of a large hotel to the exchange, and shortly
thereafter Dean came back. Dorchester asked him if he
got the money and Dean replied, "Yes, I got the money,
but they took it away from me again when I bought that
Alaska Gold," whereupon Dorchester again assumed an
appearance of great wrath and excitement. He had been
sitting in the automobile and he leaped over the side with-
out opening the door, shook Dean and upbraided him for

having lost the money. He then took the ticket out of Dean's hand and ran around the corner of the street, while Dean wrung his hands and "cried," saying, "What have I done now? What did I do wrong?" Dorchester soon came back in a disheveled condition, with his collar unbuttoned. As Mrs. Hupp testified: "He was just raving; and he said he had lost every dollar and that he had lost his firm's money and that he had lost everything he had, and carried on something terrible and acted as though he was going to take Dean's life, and it was just a terrible commotion." But after this extravaganza had run its course, a way out of the difficulty was thought of. That way, surprising as it may seem, involved the further looting of Mrs. Hupp's strong-box and included the ambitious scheme to get $50,000 more of the latter's money. In short, Dorchester knew of a pending deal in Colorado which required $75,000 to turn; if Mrs. Hupp would produce $50,000 more, the deal could be handled and ample funds received to immediately reimburse her for all the outlay; Dorchester's standing with his firm would be preserved, and the ignominy under which Dean had fallen would be at once relieved. While Mrs. Hupp gave a qualified assent to the plan, she was wise enough not to take the money with her on the trip to Colorado, where she arranged to go together with Dean and Dorchester. Dorchester, while on the train, said that it was necessary for him to stop off at one of the way stations to attend to some matters, but that he would follow on the next train and meet Mrs. Hupp with Dean at a time and place agreed upon in Colorado. After Dorchester had left in this manner Mrs. Hupp for the first time expressed misgivings as to the honesty of Dorchester, and Dean appeared to give some credit to her impressions along that line; she further took occasion to say to Dean that if she was called upon to use the $50,000 in Colorado, she proposed to stay with the money and see just how and where it was disposed of. Evidently Dean considered the prospect of further mulcting his cousin as having less promise from that point, for he decided that he had better get off at a station ahead and wait for Dorchester and see that he came through all right. Mrs. Hupp agreed. It is almost needless to say that neither Dorchester nor Dean appeared in Colorado at the time ap-

pointed. The next meeting between Mrs. Hupp and her cousin Dean occurred in February, 1920, at the Columbus, Ohio, jail, where Dean was being held after arrest on the charge contained in the indictment already referred to herein. A conversation occurred between Mrs. Hupp, Dean, and Dean's mother, in which the mother offered to mortgage a farm for $15,000, and Dean told Mrs. Hupp that if she would take that and let him go "he would sign any sort of notes or agreement and he would go down on the farm and stay there and work until it was all paid back." Mrs. Hupp responded that she "wouldn't accept money from his mother losing her farm"; that he, Dean, would, if he got free, go right on doing the same thing. It was shown in evidence that comprehensive search had been prosecuted in Los Angeles and New York City to find whether any such exchange existed as the "International," or any such brokerage firm as "Sheppard and Company." None were found to exist in either city. The officer of the bank whose name had been used by Dorchester testified that he did not know Dorchester and had never heard of "Sheppard and Company" and had no connection with any such brokerage concern. Throughout the whole operation Mrs. Hupp had been cautioned by the men to keep the matter strictly secret, so that Dorchester's employers might not learn of his "dereliction."

[1] The evidence was sufficient in its every feature to establish the guilt of defendant. The details as already narrated plainly delineate a complete scheme of fraud so bold and palpable as to make it a matter of wonder that a person of reasonable understanding could be deceived thereby. And it is fairly inferable that Mrs. Hupp would not have been despoiled of her money had it not been that Dean was able to bring to bear the weight of his relationship. Complainant was mainly influenced by a desire to relieve her cousin Dean from the embarrassment of having "unwittingly" placed his "friend" in a position of great difficulty. Dean's relationship secured him that degree of confidence of his victim necessary to the execution of the plan.

[2] It was error for the court to allow Mrs. Hupp to answer the question, "Did you at any time part with the title to that money?" But the error was not pre-

judicial, this because there was no conflict in the evidence as to the facts under which the complainant was induced to part with her money. Under those facts it was clear that she did not part with title. She was induced through the trickery of the confidence operators to deliver into their possession the $30,000 which they were to use in securing back Dorchester's "identification ticket" issued by the "stock exchange." There was no such stock exchange; hence no such valid ticket. The conditions did not exist under which the money was to be used. The atmosphere of fraud enveloped the whole transaction. Similar cases are not wanting in the books, for in truth it may be agreed that prospective victims are born every minute. We refer first to *In re Clark and Lyons,* 34 Cal. App. 440, [167 Pac. 1143], where the court held against the contention that the complainant had parted with title to his property and so could not prosecute the petitioners for larceny. The further contention there was, as here made, that the money was delivered as a loan. The court in narrating the facts and announcing its conclusions said: "The case involves the oft-told story of a bucolic and guileless individual, who, while waiting for a train at the Sacramento railroad station to convey him to his home in a northern town, after a brief sojourn in the central portion of the state, accommodatingly handed over to a brace of oily-tongued strangers $120 of his available cash, as a loan, after the latter had insidiously crept into and gained his confidence and were suddenly awakened to a realization that the freightage on certain freight which they represented that one of them had previously put on board of a freight train had to be prepaid, and that they were without sufficient funds to pay the bill. . . . We are satisfied that the inference is fairly and reasonably justified by the evidence taken before the magistrate that the petitioners, acting in confederation for that purpose, designedly and deliberately, by the artful and crafty methods in which so-called 'confidence men' are adepts, obtained possession of the money of the prosecuting witness, upon the pretext that it was to be a mere loan, with the intent to steal the same. The owner of the money not having parted with the title thereto, the crime, if any, is larceny. (*People* v. *Rae,* 66 Cal. 423, [56 Am.

Rep. 102, 6 Pac. 1]; *People* v. *Delbos,* 146 Cal. 737, [81
Pac. 131]; *People* v. *Arnold,* 17 Cal. App. 68, [118 Pac.
729]; *People* v. *Schenone,* 19 Cal. App. 280, 282, [125
Pac. 758]; *People* v. *Ballo,* 19 Cal. App. 370, [125 Pac.
1081].)'' The case of *People* v. *Delbos,* 146 Cal. 734,
[81 Pac. 131], makes clear the distinction between cases
of larceny and those where property is obtained by false
pretenses. The decision in *People* v. *Rial,* 23 Cal. App.
713, [139 Pac. 661], is also in point, both as to simi-
larity of evidence and character of contentions made.
There the victim delivered money to the confidence opera-
tors to be bet on a horse-race in a pretended poolroom.
The poolroom was accoutred with all the usual parapher-
nalia commonly employed by concerns selling pools, includ-
ing telegraph instruments which were in apparent operation.
All of these accessories were ''faked.'' In considering the
appeal in that connection the court said: ''He may have
intended that his property should abide the hazard of the
races, but the conditions under which he intended in that
event to part with his property were not present. There-
fore, it cannot be said that he parted with both the pos-
session and title to his property when he entrusted it to
the charge of a confidence operator. The decision in the
case of *Miller* v. *Commonwealth,* 78 Ky. 15, [39 Am.
Rep. 194], rested upon facts of a kind similar to those
which the evidence illustrates here, and what is there said
is particularly applicable to this case.'' (See, also, *People*
v. *Sing,* 42 Cal. App. 385, [183 Pac. 865].) The court
advised the jury with much care that it must acquit the
defendant in the event it found the complainant had parted
with title to the $30,000 or made a loan to defendant. It
would have been altogether proper for the court to have
advised the jury that parting with the possession of money
in the manner disclosed, with intent that it be used for
the purpose represented, would not in law show a parting
with title, where the money never was so used nor intended
by the defendant to be so used. Such an instruction would
be directly in line with what was said in the opinion in the
case last cited. Altogether, the instructions as given by
the court were more favorable than the defendant was
entitled to ask. They fully covered the law of the case.

The instruction asked for and refused by the court, which was to advise the jury that the flight of defendant's companion in crime, if such were shown by the evidence, was not to be considered in weighing the case against the defendant, we do not think was a proper one to give to the jury. The men were companions in crime and they worked in concert. The testimony was certainly competent as given by the complainant showing that Dorchester, after all had been agreed upon a meeting place in Colorado, made an excuse and left the train while on the way, and that neither he nor Dean appeared at the meeting place. All of these circumstances were undoubtedly proper evidence, as showing the complete falsity of the series of acts and various representations made by Dean and Dorchester. Attention is directed to some other alleged errors as to which it may be said that none are sufficient under the provisions of section 4½, article VI, of the constitution to warrant the court in reversing the judgment. One of these errors pointed to by appellant is the statement of the complainant as made to appellant when she talked with him at the jail in Ohio. The conversation as narrated by her, in so far as it showed Dean's statements made in the presence of his mother when the latter offered to mortgage her farm and pay $15,000, was altogether proper evidence. The witness, after stating that she there declared that she would not accept "money from his mother losing her farm," added that she had told him that as soon as he got free "he would perhaps get $15,000 from Dorchester and they would go right on doing the same thing that they had been doing." This latter statement might well have been stricken out in response to the motion of appellant, as it was not shown how Dean received the remark or whether he made any reply to it. The court, in our opinion, did not unduly restrict appellant in his cross-examination of the witnesses. Upon a careful examination of the entire record we are well satisfied that defendant had a fair trial and that he was properly convicted of the crime charged in the information.

The judgment and order are affirmed.

Conrey, P. J., and Shaw, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 5, 1921.

All the Justices concurred, except Shurtleff, J., who did not ·vote.