Filed 1/12/24  P. v. Johnson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| THE PEOPLE, | C096938 |
| Plaintiff and Respondent, | (Super. Ct. No. SCCR-CRF-2020-946-1) |
| v. | |
| SHANADOA WAYNE JOHNSON, | |
| Defendant and Appellant. | |

SUMMARY OF THE APPEAL

A jury found defendant Shanadoa Wayne Johnson guilty of multiple crimes arising from his schemes to defraud homeowners, primarily elderly homeowners, of thousands of dollars under the guise of performing driveway or roof repair work on their homes.  The jury's findings of guilt included four counts of first degree burglary as defined in Penal Code section 459, subdivision (a), (statutory section citations that follow are found in the Penal Code unless otherwise stated) with true findings that each burglary (1) was committed when a person other than an accomplice was present in the residence, as described in section 667.5, subdivision (c)(21) (person-present findings); and (2) was committed against a victim who was an elder as defined in section 667.9, subdivision (a).

1

Other findings of guilty included, but were not limited to, 12 counts of grand theft from an elder under section 368, subdivision (d), various violations of the Business and Professions Code that govern the lawful provision of contracting services, and findings that the defendant had misappropriated construction funds in violation of section 484b. The jury also found the defendant guilty of other offenses not directly related to his interactions with the homeowners.

The court sentenced the defendant to a combined total term of 21 years in prison.

On appeal, the defendant raises three arguments. First, he argues that one of his convictions for grand theft of an elder under section 368, subdivision (d), is not supported by substantial evidence and must be reversed. The defendant reasons the grand theft finding was not supported because the victim's grandson successfully stopped payment on the check the victim wrote payable to the defendant, and, thus, the defendant never received any money from that victim.

Second, the defendant argues that the trial court abused its discretion and violated his constitutional rights by permitting the People to introduce evidence of prior uncharged bad acts under Evidence Code section 1101, subdivision (b). The defendant says the evidence ought to have been excluded under Evidence Code section 352.

Third, the defendant argues that the trial court abused its discretion when it denied his request to have the trial court strike the person-present findings on the first-degree burglary charges.

We are not persuaded by defendant's arguments.

In reviewing the record of this case, we note the trial court misidentified the convictions on two counts when it pronounced its sentence, and we asked the parties their views on how we should resolve this error on appeal. The defendant argues we must remand the case for resentencing on those two counts. The People argue we can correct the error on appeal. We agree with the People.

2

Facts

### Schemes to Defraud

The convictions at issue in this matter are based on testimony recounting 10 separate instances in which the defendant or an associate of his approached a homeowner at their home about doing work on or near their driveway or their roof. In most of the incidents, the homeowners were elderly.

The defendant would demonstrate his legitimacy as a contractor and the trust of the homeowners by various means, including but not limited to, providing contractor's license numbers that later proved not to be his, falsely representing he had worked on the property before or was related to a person who had worked on the property before who had since retired, hinting the owner should be able to recognize him from a prior interaction, supplying a business card, or suggesting he could do good work at a very good price. The defendant would then charge the homeowner thousands of dollars for the work he promised to do, and then not do all the work promised, and/or do an extremely poor job of what he did do, often damaging property in the process.

In some instances, when a homeowner refused to pay the defendant the full amount he expected for the work, he would confront them angrily and make threats to seek legal redress or harm their reputation.

Experts who examined some of the defendant's work testified the work had a value that was a small fraction of what he charged in some instances and no value in others.

In his interactions with the victims, the defendant sometimes worked with persons identified as Wayne Johnson, Brandon Johnson, and Elesia Kay Faill.

The following three incidents, which are central to our analysis of two of the three issues raised in this appeal, are illustrative.

3

<u>Driveway</u> <u>Work</u> <u>for</u> <u>M.B.</u>

The following facts are taken from the testimony of M.B. and roofing and paving expert Ronald Powers.

M.B. was born in October 1930.

On July 29, 2020, the defendant went to M.B.'s home and asked her about doing some paving work on her driveway. M.B. asked the defendant if he was John Rhoades's son. John Rhoades had done some previous work on her driveway. The defendant said he was Rhoades's son, and explained he was not with his "dad" because his "dad" had retired. The defendant's representation that he was Rhoades's son gave M.B. confidence in defendant's work.

The defendant told M.B. what work he would do, and M.B. thought he sounded legitimate.

The defendant arrived at M.B.'s home in a single pick-up truck that looked like it might have been rented; there was a woman in the truck.

That day, M.B. wrote and gave the defendant a check for $8,700 as a first payment for work to be performed.

Thereafter the defendant put some material on the driveway, but he didn't clean the whole driveway or cover it.

The same day, the defendant came back and said he had done some additional work at the bottom of M.B.'s driveway, and he told M.B. that work was for an additional amount. M.B. told the defendant she could not write him another check that day and asked if she could write it after she had a chance to get to the bank and withdraw more money. The defendant said he would come back on a later date.

When the defendant came to M.B.'s house around August 4, 2020, she told him she had a check for him. The defendant asked M.B. if she would mind combining the amounts from the two checks into one. So, M.B. wrote a check that combined the $8,700

4

with the additional amount the second check would have been for. After doing some more work, the defendant came back and asked for the new check. The new check was for the combined amount of $13,000. The defendant was not supposed to keep the $8,700 check, and M.B. did not intend for the defendant to have the $8,700 in addition to the $13,000. But defendant did not return the $8,700 check. The defendant and M.B. were inside her house for five to seven minutes when she gave him the $13,000 check.

Later, when M.B. received her bank statement, she learned that the defendant had cashed both checks. M.B. called her bank and tried to put a stop payment on the $8,700 check, but she was not able to do so.

M.B. tried to reach the defendant when she realized he had the $8,700, but could not reach him. Thereafter, M.B. called the sheriff.

M.B. described the work the defendant did on her driveway as a "mess" that resulted in discolored brick. She had expected the defendant to coat the entire driveway, but instead he splashed a substance all over, including on a red brick walkway, spilled some gravel with "black . . . sticky stuff" over some cracks caused by trees, and left bare concrete where she had expected some coating.

Ronald Powers was accepted by the court as an expert in roofing and paving. He testified that, in February 2022 he visited M.B.'s home. He could not see that any work had been done on the driveway and there was no sealant when he looked at it. He estimated that any work that might have been done on M.B.'s property had zero value.

### Roofing Work for J.B. & I.B.

The following facts are taken from the testimony of J.B., Jr., I.B.,[1] Ronald Powers, and Jason Hamdan, accepted by the court as an expert in tax fraud, tax evasion, financial investigation, and banking records.

---

[1] I.B.'s testimony was taken during a preliminary hearing and read at trial.

J.B., Jr.,'s parents are J.B. and I.B. J.B. was born in February 1930, and I.B. was born in January 1935. J.B., Jr., J.B., and I.B. own a home together.

I.B. testified that in late May or early June 2020 the defendant came to the B.'s home to discuss doing some work. The defendant first asked I.B. about doing work on her driveway, but she said no to that. When I.B. mentioned she had some leaks in the house, the defendant said he used to do roofing, could fix the leaks in her roof, and that he was wonderful at that type of work. He gave I.B. an estimate to fix leaks, replace things on the roof, do some fixing around the chimney and windows, and things like that. The defendant said that somebody else would charge I.B. twice as much for the same work. The defendant did not tell I.B. he was a contractor, but I.B. relied on the defendant's representations that he knew what he was doing and would do a good job. I.B. spoke with the defendant in her house.

The defendant gave an initial estimate of $14,000 for the work, but when the elder B. said no, he offered $10,500. While in the house, the defendant asked for a check for $9,800 to cover materials. I.B. wrote the defendant a check for $9,800, but then did not give it to the defendant, instead putting it on a table in the room of the house where she and the defendant were talking when she realized she did not have enough money in her checking account to cover the amount of the check. She did not intend for the defendant to have the check for $9,800 because, as she told him, she did not have enough money in her account to cover the $9,800 check.

I.B. spoke with J.B., who was in the bedroom, and then they both wrote checks to come up with close to the $9,800 amount, and I.B. paid the defendant with those. J.B. wrote a check to the defendant for $4,600. I.B. wrote another check for $3,900. I.B. realized the combined checks were a little less than the requested amount and said they would make it up later when more work was done.

After the defendant left, I.B. realized she could no longer find the first check she had written for $9,800, and she never saw it again.

6

After the work started, at I.B.'s insistence, the defendant wrote up a contract reflecting the $10,500 estimate. The document mentions asphalt, though that is not something I.B. wanted. A contract J.B., Jr., reviewed identified tasks to be performed as resealing windows, repairing the roof with 3-tba asphalt roofing, sealing a joint near the garage and office area, replacing some eave boards on the backside of the house, fixing eave boards, coating vents, refurbishing the chimney, applying a clear shield to the entire roof, applying Copper-Green to a bad board, and reinsulating eaves.

After the work started, the defendant came into the home and told I.B. the work was costing more, and J.B. wrote an additional check for $2,000. J.B. and I.B. wrote additional checks to the defendant and to a Wayne Johnson, who they believed was the defendant's brother, and who was supposed to do some mold and insect work in the home. A third man sometimes was present who carried tools and ladders outside the home.

All the checks I.B. and J.B. wrote, including the one for $9,800, cleared and the money came out of the accounts the checks were drawn on. In all, I.B. says $24,100 came from her bank account, though the estimate for the work had been for $10,500.

I.B. testified that the last time she saw defendant was the day she told him her son would be coming to check all the work.

I.B. did not have the chance to inspect any work done by the defendant until after he was gone. She doesn't believe he did any of the work he was supposed to except fix a leak by the chimney. Some of the things I.B. testified the defendant had promised to do included replacing more things on the roof, and fixing a leak caused by some rot near the entry. Instead, I.B. testified, he just nailed a board back by the door that she had wanted fixed or replaced and painted some things white, which she characterized as "horrible looking."

J.B., Jr., looked at the work after it was done. He could clearly see that much of the work that was to be done had not been done. When the defendant did not show up to

7

work on the house again, J.B., Jr., tried to reach the defendant using a number the defendant had given I.B. When the defendant did not answer J.B., Jr.,'s calls, J.B., Jr., tried texting the defendant. They exchanged some texts, but the defendant did not always respond, and when the defendant responded his answers were "unusual." For example, one response was just a number, an asterisk, and a period.

When J.B., Jr., discovered that a missing check had been cashed, he called law enforcement. His actions included filing a complaint with the sheriff's department regarding the $9,800 check.

Ronald Powers also examined the B.'s property in February 2022. At trial, he looked at photos J.B., Jr., had taken of the work around June 12, 2020. He observed some black spray applied to rotted roof boards that should have been repaired, and he opined that black spray had no value and was not the correct way to fix the boards. He saw screws applied to some boards where the wood ought to have been replaced. He testified the use of the screws had no meaningful value. He saw some white spray paint applied to the house where a hole remained. This work had no value. He saw some nails applied to the underside of the roof, and he opined there was no value to that work. He saw some other places where screws had been applied at no real value. He did see some Copper-Green applied in a closet, but there was no meaningful value to what had been sprayed. He also observed some Copper-Green sprayed on the roof, where it appears it was held down by a two-by-four or a couple pieces of wood that made up a similar size, which is not an appropriate way to fix a roof. He noted the wood might cost $25, but the work that had been done had no value. He saw a white spray of some sort that may have partially filled some nail holes but had no value and which did nothing to remediate rust in the holes.

He also saw some black and white paint along the roof that may have cost something but did not benefit the house. He saw some type of mastic applied to a joint. He saw some mastic sprayed around the skylight that may or may not have been a proper

form to use on the skylight.  He saw paint sprayed around part of the chimney.  He thought this painting was maybe worth $20 in parts and labor.  He opined that some black substance applied to the chimney flume was worth maybe $20.  Some mastic applied underneath the rock around the chimney that could have been an effort at some water proofing was possibly worth $30.  He observed a small amount of asphalt applied to the roof that may have stopped a leak, that was worth about $20.  He observed some black substance applied to a vent that maybe cost $20 or $30.  He assigned similar material and labor costs to some black paint applied directly to the roofing and another spot of paint.  He noted that with these values, the material costs would have been very small, and most of it would go towards labor.

When Powers inspected the skylight and a pipe himself in February 2022, cracks had opened up and the material that he had observed in J.B., Jr.,'s photos appeared to have washed away, rendering that work worthless.  He saw no evidence of resealed windows.  He saw no new pieces of 3-tab asphalt.  He saw no sealing on the joint to the office/garage.  He did not see a clear seal applied to the roof.  The Copper-Green he saw applied was in the closet.  The insulation under the boards of the eaves looked like it had been there awhile—i.e., it was not new.

In all, Powers estimated the work done at the B.'s was worth at most $200.

Jason Hamdan a criminal investigator for the California Franchise Tax Board, investigated the tax matters in this case.  His investigation included reviewing bank records he obtained through a search warrant.  He saw over $20,000, including the checks for $9,800, $3,900, and $4,600 going into the defendant's accounts through the checks written by J.B and I.B.

### Driveway Work for J.H.

The following summary is taken from the testimony of J.E.

J.E. takes care of his grandfather, J.H. who was born in September 1924. J.H. was 98 at the time of trial. J.E. acts as his grandfather's fiduciary and has power of attorney over his financial and medical matters. J.E. lives with his grandfather.

In March 2020, the defendant came to J.H.'s house and saw the defendant putting some chemical on the asphalt driveway. J.E. asked J.H. who was in the driveway, and J.H. told him it was a guy from the seal company.

Prior to the day J.E. encountered the defendant, Precision Paving had replaced the asphalt on J.H.'s driveway. The amount that J.E. and J.H. had paid Precision Paving for the asphalt included a sealant. Precision Paving had indicated they wanted to let the asphalt settle before applying the seal. After workers from Precision Paving finished paving they said they would come back at no additional cost to put the sealant on.

At the time the defendant appeared at the house, Precision Paving had not yet come back to apply the sealant.

J.E. approached the defendant and said, "I understand you're from Precision Paving." The defendant said that, yes, he was from Precision Paving. Pursuant to the parties' stipulation, the defendant has never been employed by or in any way affiliated with "Precision Asphalt."

We note that, at first, J.E. testified about "Precision Paving" doing the prior work. But when the stipulation concerning the defendant's prior association with "Precision Asphalt" came into evidence, the People started using the name "Precision Asphalt." J.E. didn't seem to quibble with the use of "Asphalt" instead of "Paving."

J.E. saw a woman in a pick-up truck when he was at J.H.'s house.

Once he looked at the driveway, J.E. didn't think it looked right, and he tried to reach Precision Paving but was unable to contact them.

Later, on March 25, 2020, the defendant came into the house and gave J.E. and J.H. an invoice. J.E. and J.H. were present and maybe six to seven feet away from the defendant. J.E. had opened the door to the defendant.

10

The invoice was for the cleaning and application of melted rubber into cracks and for the application of an oil-based seal at a flat cost of $6,800.

J.E. immediately objected to the invoice, telling defendant the "this is supposed to be for free." The defendant told J.E. that was wrong, and the cost was "by the bucket." J.E. became concerned that the defendant might not really be from Precision Asphalt.

Because J.E. believed he and J.H. were in no position to defend themselves, he thought it best to write the check. J.E. wrote the check from an account that is in his and J.H.'s name, but which he considers J.H.'s account and J.H. signed the check.

J.E. gave the check to the defendant. J.E. did not actually want the defendant to have the money, because he was concerned the job the defendant had done was not legitimate. J.E. gave the defendant the check because he did not want to cause a confrontation. J.E. feels he has to protect his grandfather and saw the defendant as a stranger in their home when J.E. and J.H. could not defend themselves. J.E. felt it was best to just give the defendant a payment and get him out of the house.

Shortly after the defendant left, within a couple hours on the same day, rain and hail and water that collected on the driveway washed away all the "sealant." J.E. has since resealed the driveway twice himself.

The next day, J.E. contacted Adult Protective Services. He told an Adult Protective Services employee that the defendant had tried to take financial advantage of his grandfather. He also called the Sheriff's Department the day he called Adult Protective Services.

J.E. put a stop payment on the check around midnight on March 26, 2020. No money was taken out of J.H.'s account.

The defendant later called J.E. and said the check did not clear, and J.E. said he may have owed the defendant something, but not $6,800. The defendant later called J.E. again and said that J.E. would hear from the defendant's lawyer. J.E. responded that he had already contacted the authorities and Adult Protective Services, and the defendant

11

hung up.  During one of the calls, J.E. also asked for the defendant's contractor's license and the defendant refused to provide it.

Procedural Background

### Guilt Phase:  Jury Findings

The People filed the Third Amended Consolidated Information (Information) in this action on May 17, 2022.  The defendant entered pleas of not guilty to the Information and denied its allegations.

The Information set forth 84 counts.  The Information also alleged that the defendant had prior convictions that fell within section 1203, subdivision (e)(4), and that there were a variety of aggravating sentencing factors.  Many of the counts were dismissed during the trial.

A jury trial began on June 20, 2022.  The court bifurcated the trial on the alleged aggravating factors and prior convictions.

The jury made the following findings with respect to the three fact patterns we have described in detail above:

With respect to M.B., the jury found that defendant was guilty of one count of first degree burglary under section 459, subdivision (a), and it found it was true that there was a person other than an accomplice present when the defendant committed the burglary as within the meaning of section 667.5, subdivision (c)(21), and that the victim of the burglary was an elder within the meaning of section 667.9, subdivision (a).  With respect to M.B., the jury also found the defendant guilty of two counts of grand theft from an elder under section 368, subdivision (d), one count of misappropriation of construction funds over $2,350 under section 484b, and one count of contracting without a license in violation of Business and Professions Code section 7028, subdivision (a)(1).

With respect to I.B. and J.B., the jury found that defendant was guilty on two counts of first degree burglary under section 459, subdivision (a), and it found true that in

12

both instances there was a person other than an accomplice present when he committed the burglary within the meaning of section 667.5, subdivision (c)(21), and that the victim of the burglary was an elder as described in section 667.9, subdivision (a). With respect to I.B. and J.B., the jury also found the defendant guilty of five counts of grand theft from an elder under section 368, subdivision (d), one count of misappropriation of construction funds over $2,350 under section 484b, and one count of contracting without a license in violation of Business and Professions Code section 7028, subdivision (a)(1).

With respect to J.H., the jury found that defendant was guilty of one count of first degree burglary under section 459, subdivision (a), and it found true that there was a person other than an accomplice present when he committed the burglary within the meaning of section 667.5, subdivision (c)(21), and that the victim of the burglary was an elder as described in section 667.9, subdivision (a). Also with respect to J.H., the jury also found the defendant guilty of one count of grand theft from an elder under section 368, subdivision (d), and one count of contracting without a license in violation of Business and Professions Code section 7028, subdivision (a)(1). With respect to J.H., the jury found the defendant not guilty of diverting construction funds in excess of $2,350 in violation of section 484b, or of a lesser included offense of diverting construction funds under $2,350.

As to the other alleged victims of the defendant's criminal schemes the jury found:

The defendant was guilty of five additional counts of grand theft from an elder under section 368, subdivision (d) and five counts of grand theft under section 487, subdivision (a).

The defendant was found guilty of six additional counts of diverting/misappropriating construction funds over $2,350 under section 484b. In one instance, he was found not guilty of misappropriating construction funds over $2,350 as contemplated by section 484b, but guilty of misappropriating under $2,350.

13

The defendant was found guilty of seven additional counts of contracting without a license in violation of Business and Professions Code section 7028, subdivision (a).

The defendant was convicted of one count of use of a fraudulent contractor's license with intent to defraud in violation of Business and Professions Code section 7027.3, one count of advertising for construction work without a valid contractor's license in violation of Business and Professions Code section 7027.1, subdivision (a), two counts of charging an excessive down payment in violation of Business and Professions code section 7159.5, subdivision (a)(3), one count of second degree burglary under section 459, and one count of extortion in violation of section 518.

The jury also found the defendant guilty of various offenses that are not central to this appeal, including one count of providing false identification to a police officer in violation of section 148.9, subdivision (a), one count of driving with a suspended license in violation of Vehicle Code section 14601.1, subdivision (a), one count of failure to file an income tax return in violation of Revenue and Taxation Code section 19706, one count of conspiracy under section 182, subdivision (a)(1) in relation to a scheme to commit welfare fraud, one count of perjury in violation of section 118, subdivision (a), and one count of the receipt of aid in excess of $950 through misrepresentation in violation of Welfare and Institutions Code section 10980, subdivision (c)(2). The jury found defendant guilty of failure to appear under section 1320, subdivision (b), and found true the special allegation that this offense was committed while the defendant was on bail or released on his own recognizance within the meaning of section 12022.1.

### Trial on Bifurcated Issues

The defendant waived his right to a jury trial on the bifurcated issues.

The court found, beyond a reasonable doubt, that the defendant had various prior convictions.

The court also found beyond a reasonable doubt the truth of various aggravating factors, including that the victim was particularly vulnerable; that the defendant induced another to participate in the crimes and occupied a position of leadership in the commission of the crimes; that the manner in which the crime was carried out indicates planning, sophistication, and professionalism; that in some of the instances the crime involved the attempted or actual taking or damage of great monetary value; that the defendant took advantage of a position of trust to commit the offense; that the defendant's prior convictions as an adult and in sustained juvenile delinquency proceedings are numerous and increasing in seriousness; that defendant had served a prior prison term; that the defendant's prior performance on probation and parole was unsatisfactory; and that a victim was unable to defend himself or herself due to age or significant disability within the meaning of section 1170.85, subdivision (b).

The trial court found not true aggravating factors that the crime involved great violence, great bodily harm, threat to do great bodily harm or acts disclosing a high degree or cruelty, viciousness, and callousness; that the defendant threatened a witness, unlawfully prevented or dissuaded a witness from testifying, suborned perjury, and illegally interfered with the judicial process; that the defendant was on probation or parole when the crime was committed; and that the victim was an elder and dependent adult as defined by section 368, and specifically relating to sections 502.9, 515, and 525.

Sentencing and Appeal

The court sentence the defendant to a total of 21 years in prison as follows:

With respect to M.B., it sentenced the defendant to six years for the first-degree burglary with the person-present enhancement under section 667.5, subdivision (c)(21), and struck the sentencing enhancement—but not the finding—for the section 667.9, subdivision (a), finding that the victim was an elder. Then the trial court added a consecutive sentence of one year for one of the two grand theft from an elder convictions.

Applying section 654, the trial court imposed but stayed the sentence on the other conviction for grand theft from an elder and on the conviction for the misappropriation of construction funds over $2,350. The prison sentence for the crimes committed against M.B. totaled seven years.

With respect to I.B. and J.B., the trial court sentenced the defendant to a consecutive term of one year and four months for each of the two first-degree burglary with the person-present enhancements under section 667.5, subdivision (c)(21), and struck the sentencing enhancements—but not the findings—for the section 667.9, subdivision (a), findings that the victims were elder. The trial court then added a consecutive one-year sentence for one of the five grand theft from an elder convictions. Applying section 654, the trial court imposed but stayed the sentence on the other convictions for grand theft from an elder and the convictions for misappropriation of construction funds over $2,350. Regarding the I.B./J.B. convictions the prison sentence totaled three years and eight months.

With respect to J.H., the trial court sentenced the defendant to a consecutive term of one year and four months for the first-degree burglary with the person-present enhancement under section 667.5, subdivision (c)(21), and struck the sentencing enhancement—but not the finding—for the section 667.9, subdivision (a), finding that the victim was an elder. Applying section 654, the trial court then imposed but stayed a sentence for the grand theft from an elder conviction. As to the criminal acts against J.H. the court sentenced defendant to one year and four months.

The court imposed consecutive one-year sentences for each of the five counts where the jury had found the defendant guilty of grand theft from an elder convictions. However, in announcing the conviction on the record for one of those counts, count 48, and in recording the count and sentence on the abstract of judgment, the trial court misidentified the underlying offense for count 48 as a violation of section 484b, which governs the misappropriation of construction funds.

16

The court imposed eight-month consecutive sentences for four of the five grand theft convictions, and under section 654 imposed but stayed a sentence on the fifth grand theft conviction.

The court imposed and stayed, under section 654, eight-month sentences on five of the six additional misappropriation of construction funds over $2,350 convictions in violation of section 484b. The court erroneously treated the sixth additional conviction for the misappropriation of construction funds over $2,350, in count 45, as a conviction for grand theft under section 487, subdivision (a), imposed a sentence of one year, then stayed that sentence under section 654.

The court imposed a consecutive sentence of eight months for the second-degree burglary conviction.

The court imposed a concurrent three-year term for the use of a fraudulent contractor's license with intent to defraud count.

The trial court imposed an eight-month consecutive sentence for failure to file an income tax return in violation of Revenue and Taxation Code section 19706. With respect to the other convictions not directly tied to the defendant's schemes to defraud homeowners, the trial court imposed concurrent sentences or stayed the sentences under section 654.

The trial court imposed a 364-day concurrent jail term as punishment for a variety of offenses, including the contracting without a license conviction, that were classified as misdemeanors.

The trial court ordered the defendant to make various restitution payments to his victims, and additional fines were imposed and suspended or stayed.

The defendant filed a notice of appeal on August 30, 2022.

DISCUSSION

I

*Count 65 Conviction for Grand Theft of an Elder, J.H.*

In Count 65, the jury found defendant guilty of grand theft against an elder, J.H., under section 368, subdivision (d). The defendant argues that this finding is not supported by substantial evidence and must be reversed, because the defendant never actually obtained any money from J.H. since the check was canceled before defendant could cash it. We find substantial evidence supports the jury's verdict on Count 65.

A.      Standard of Review

"The law governing sufficiency-of-the-evidence challenges is well established . . . . [Citations.] In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence-that is, evidence that is reasonable, credible, and of solid value-supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639.) In other words, " '[a] reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

18

B.    <u>Grand</u> <u>Theft</u> <u>from</u> <u>an</u> <u>Elder</u> <u>Adult</u>

Section 368, subdivision (d), calls for an additional fine for persons who commit theft, embezzlement, forgery, fraud, or a section 530.5 (identity theft) violation when the victim of the crime is an elder or dependent adult.

Section 484, subdivision (a), sets forth various mechanisms through which one may be found guilty of theft. (See *also People v. Wooten* (1996) 44 Cal.App.4th 1834, 1846 ["[I]n California, the various common law theories of theft, including embezzlement, have been consolidated"].) For example, here the jury was instructed on how theft might be accomplished by larceny, the use of false pretense, trick, or embezzlement.

"Larceny 'is committed by every person who (1) takes possession (2) of personal property (3) owned or possessed by another, (4) by means of trespass and (5) with intent to steal the property, and (6) carries the property away.' (*People v. Davis* (1998) 19 Cal.4th 301, 305 [].)" (*People v. Vidana* (2016) 1 Cal.5th 632, 639.)

Theft by false pretense requires that " '(1) the defendant made a false pretense or representation to the owner of property; (2) with the intent to defraud the owner of that property; and (3) the owner transferred the property to the defendant in reliance on the representation.' (*People v. Wooten*[, *supra*,] 44 Cal.App.4th [at p.] 1842 [].)" (*People v. Williams* (2013) 57 Cal.4th 776, 787.)

"The crime of theft by trick or device requires: 1) obtaining possession of property of another by some trick or device; 2) intent by the wrongdoer to convert it to his own use and to permanently deprive the owner thereof; and 3) transfer of possession but not title to the wrongdoer," and is similar to theft by false pretenses. (*People v. Frederick* (2006) 142 Cal.App.4th 400, 417.) Where, "[t]heft by trick or device involves a transfer of possession only; theft by false pretenses involves a transfer of title and possession. [Citation.] Generally, if a victim gives money to a wrongdoer with the understanding that

19

it will be spent for a particular purpose, title does not pass to the wrongdoer.  [Citation.] Under those circumstances, the wrongdoer may have committed the crime of theft by trick or device."  (*Ibid.*)

Under section 487, subdivision (a), except in circumstances not applicable here, "Grand theft" as opposed to petty theft includes "theft committed . . . [¶] [w]hen the money, labor, real property, or personal property taken is of a value exceeding nine hundred fifty dollars ($950)."  (See also § 486 [identifying the two degrees of theft as petty theft and grand theft].)  "In determining the value of the property obtained . . . the reasonable and fair market value shall be the test."  (§ 484, subd. (a); see also *People v. Romanowski* (2017) 2 Cal.5th 903, 917 [applying valuation method to any theft punished based on the stolen property's value].)  Under section 492, "[i]f the thing stolen consists of any evidence of debt, or other written instrument, the amount of money due thereupon, or secured to be paid thereby, and remaining unsatisfied, or which in any contingency might be collected thereon, or the value of the property the title to which is shown thereby, or the sum which might be recovered in the absence thereof, is the value of the thing stolen."

To constitute a theft, the property taken, " 'need not . . . be retained by the perpetrator.'  (CALJIC No. 14.02.)  'Asportation of the property with the intention to appropriate it is sufficient to constitute larceny even though the property may subsequently be returned to the owner. . . .  The fact that a thief is prevented by an officer from getting away with the property, or that he may change his mind and return the property to escape prosecution for the crime, does not relieve him from the consequences of the theft.  [Citations.]  . . . [T]heft may be committed when the accused persons, with a preconceived design to obtain and appropriate property by means of fraud or trickery, thereby gain possession of the property, even though they do not retain or use it for their own benefit.  [Citation.]'  (*People v. Post* (1946) 76 Cal.App.2d 511, 514 [].)"  (*People v. Shannon* (1998) 66 Cal.App.4th 649, 656.)

20

C.     Application to this Appeal

In his opening brief, the defendant argued that although the check J.H. and J.E. gave him was for $6,800, because J.E. stopped payment on the check before the defendant could cash it, the defendant never obtained anything of value from J.E. and no grand theft occurred. In their respondent's brief, the People agreed with this argument. However, neither party considered the import of section 492 in their initial brief, and we asked both parties to submit supplemental briefing on this issue addressing section 492.

Tellingly, in his opening supplemental brief, while continuing to argue the check had no value, the defendant makes no mention of section 492, leaving all consideration of it for his supplemental reply. In contrast, in their supplemental briefing, the People considered section 492 and modified their position to argue sufficient evidence supports a finding that the stolen check was worth more than $950 and, therefore, supports a finding of grand theft. We agree with the People.

The check was written for $6,800. The evidence suggests that, but for J.E. having stopped payment on the check the defendant would have been able to cash the check and collect $6,800. That is, between the time the defendant was given the check and the time it was canceled, "the thing stolen" consisted of a "written instrument," and "the amount of money due thereupon, or secured to be paid thereby, and remaining unsatisfied, or which in any contingency might be collected thereon," was $6,800. That J.E. managed to cancel the check does not change that it was worth $6,800 for these hours. During that time, the defendant possessed a wrongfully obtained check that he could have cashed for $6,800. This was still a theft, and given the value of the check, it constituted grand theft. (*People v. Post, supra,* 76 Cal.App.2d at p. 514 ["Grand theft may be committed when the accused persons, with a preconceived design to obtain and appropriate property by means of fraud or trickery, thereby gain possession of the property, even though they do not retain or use it for their own benefit"].)

21

*People v. Quiel* (1945) 68 Cal.App.2d 674 (*Quiel*) and *People v. Rial* (1914) 23 Cal.App. 713 (*Rial*) are instructive on how to apply the statutes to evaluate the check at issue in this case.

In *Quiel*, *supra*, 68 Cal.App.2d at pages 676 and 680, the court of appeal affirmed the defendant's petty theft conviction. The defendant had snatched a purse that contained two bank checks, one for $32 and one for $34, from a car. (*Id.* at p. 677.) However, the defendant promptly ditched the purse which still contained the checks, and the owner later cashed the checks. (*Ibid.*) In upholding the conviction, the court found there was adequate evidence that the purse and contents had intrinsic value, reasoning, in part, that, "[t]he evidence shows that the purse contained two bank checks for specified amounts which were afterward cashed for their face value . . . . Proof of unpaid bank checks of specified amounts is sufficient evidence of values of the sums 'which in any contingency might be collected thereon.' (Pen. Code, § 492.) The evidence in this case shows that the checks were subsequently cashed for their face values." (*Quiel*¸ at p. 678.)

In *Rial*, *supra*, 23 Cal.App. at pages 715 and 721, the court of appeal affirmed a defendant's conviction for grand larceny after he had stolen $40 cash, a bank draft for $100, and a certificate of deposit for $5,000. In affirming the conviction, the court explained, "It was not necessary that it should be shown that the property taken was applied to some use by the defendant or his confederates before the crime was made out. When defendant obtained possession of the property of the complainant through the fraudulent means employed and with intent to deprive the owner thereof, the crime was complete; *as much so as had he snatched it from the person of complainant and starting to run away was caught and the property taken back. The draft and certificate of deposit at the time they passed into the defendant's possession were valid and their value was the sum that might have been collected thereon, as is provided by section 492 of the Penal Code. The fact that complainant stopped payment on the five thousand dollar certificate*

22

*of deposit after delivery, did not make the act of defendant in obtaining possession thereof any the less criminal.*" (*Id.* at p. 719, italics added.)

The defendant's efforts to persuade this court *Quiel* and *Rial* are inapposite are not persuasive. First, he points out that *Quiel* and *Rial* pre-dated *Romanowski*—which noted that section 484, subdivision (a), "requires courts to determine the value of property obtained by theft based on 'reasonable and fair market value.' " (*People v. Romanowski, supra,* 2 Cal.5th at p. 914.) Second, he states the cases relied on "intrinsic value" rather than "fair market value" to determine the value of the written instruments at issue. This line of argument ignores that in both *Quiel¸ supra*, 68 Cal.App.2d at page 678 and *Rial, supra*, 23 Cal.App. at page 719, the courts based their valuation of the written instruments on a statute, section 492, that remains good law and in the chapter of the Penal Code governing larceny, and which specifically governs the valuation of written instruments that can be collected on. (See *Molenda v. Department of Motor Vehicles* (2009) 172 Cal.App.4th 974, 993 [a more specific statute controls over a more general one touching on the same subject].) In a third argument, the defendant claims *Rial* is a case about obtaining money by false pretenses and not larceny, but that ignores both (1) the nature of the means through which the defendant obtained the check at issue here; and (2) that the *Rial* court specified the reasoning it applied was the same as it would in a more traditional example of theft where someone might snatch an item from their victim. That here the defendant secured the check by using the combined forces of false representations *and* coercive fear does not make *Rial*'s reasoning regarding how to value the written instrument taken any less apt.

The defendant's efforts in his supplemental opening brief to persuade us that the face value of the check was not its value at the time he secured it by theft are unavailing. To begin with, the court rulings the defendant cites for the authority that there needed to be more evidence as to the value the check may have received under a "reasonable and fair market value" test—possibly on the black market—are inapposite. *People v.*

23

*Romanowski, supra,* 2 Cal.5th at pages 905-906 and *Caretto v. Superior Court* (2018) 28 Cal.App.5th 909, 912 considered the value of a stolen bank access card and debit cards, which are very different from a legally drawn check. *United States v. Luckey* (9th Cir. 1981) 655 F.2d 203, 204, concerned a blank dividend check taken from the bank's corporate trust department, which, again, is not the same as a legally drafted check with an establish face value. *People v. Portillo* (2023) 91 Cal.App.5th 577, 583, did not concern a legal written instrument with a stated face value, but boxes of adjustable dumbbells. Under section 492, when dealing with a legally valid instrument, the "amount of money due thereupon" is the "value of the thing stolen." (See *People v. Caridis* (1915) 29 Cal.App. 166, 168 [section 492 "contemplates and controls the value to be placed . . . upon written instruments which create some legal right and constitute a subsisting and an enforceable evidence of a debt"].) Here, at the time the defendant carried the check away, that value was $6,800.

The cases the defendant cites in his reply fair no better because they do not involve the taking of legally valid checks. (See *People v. Cook* (1965) 233 Cal.App.2d 435, 436 [stolen items were suits]; *People v. Lizarraga* (1954) 122 Cal.App.2d 436, 437 [stolen item was a fur]; *People v. Latham* (1941) 43 Cal.App.2d 35, 36 [stolen items included four checkwriters, a robe, two bathing suits, a scrap book and a wheel and tire]; *People v. Renfro* (1967) 250 Cal.App.2d 921, 922 [defendant stole telephone wire]; *People v. Pena* (1977) 68 Cal.App.3d 100, 102 [defendant stole leather jackets]; *People v. Sanders* (1998) 67 Cal.App.4th 1403, 1409 [alleged property theft accomplished by recording fraudulent/forged deeds].)

There was substantial evidence to support a finding that the defendant obtained a check from J.H. that was worth $6,800 at the time the theft was completed. The defendant has not demonstrated the jury erred in finding him guilty on count 65.

II

*Evidence Code Section 1101, Subdivision (b), Evidence*

Defendant argues the trial court abused its discretion when it admitted evidence of five uncharged prior bad acts.  There was no error.

A.    Additional <u>Background</u>

1.    <u>Motions in Limine Regarding Prior Bad Acts and the Court's Ruling</u>

Prior to trial, the People filed a motion in limine to submit evidence of defendant's prior bad acts under Evidence Code section 1101, subdivision (b).  The People proposed submitting evidence of eight prior uncharged incidents involving elder theft they characterized as "similar to the conduct for which he is charged" in this action.

In contrast, the defendant's motions in limine included a request to exclude evidence of his prior bad acts under Evidence Code sections 352 and 1101.

The trial court allowed for the admission of evidence of the five most recent prior bad acts, observing that the information could come in with respect to the issue of intent. In stating its reasoning for its ruling, the trial court explained that in limiting the number of incidents to five, it was balancing the potentially prejudicial impact of including the evidence and the amount of time including it might consume with the utility of the proposed evidence.

2.    <u>Stipulations</u>

The prior-acts evidence came in by way of stipulation and the facts can be summarized as follows:

*Incident 1:*  B.C. was born in January 1935.  In December 2020 the defendant told her she needed some work done in her driveway.  B.C. paid $100 for the work. The defendant then told B.C. she needed some additional work done on the driveway, which B.C. paid the defendant $200 to do.  In the next weeks, the defendant went to B.C. again

25

several times, each time telling her she needed additional work at an additional cost. B.C. would pay him. In total, B.C. paid the defendant $55,400. In February 2021, B.C.'s son, M.C., concluded the defendant had done no significant work on the driveway, told B.C. to stop giving the defendant money, and called the county sheriff's department. The work the defendant performed involved spraying a single layer of some sealant on B.C.'s driveway. The defendant also sprayed areas he was not supposed to, including B.C.'s trash cans and decorative bricks and stones that lined her driveway. The sealant remained sticky and in March 2021 would become detached with the least bit of pressure, even though the sealant was supposed to have dried. The entire driveway was chipping. The defendant cashed the checks B.C. wrote. According to their bank records, the defendant's brother, Brandon Johnson, and father, Bennie Wayne Johnson, also received checks from B.C.

*Incident 2:* S.H. was born in 1937. The defendant came to her house in January 2020, told her he had installed her roof 10 years earlier, that the roof had a 10-year warranty, and that he had come to service the roof. The defendant told S.H. the roof needed cleaning and an oil spray, and he did not tell her there would be a charge for this work. The defendant did not give S.H. an invoice. The defendant asked S.H. if her husband was still alive, and she said her husband had died six years before. The defendant said he remembered selling S.H.'s husband the roof. S.H. left, and when she returned a few hours later, the defendant and two others who had been with him were gone. The defendant came back the next day and told S.H. he planned to put some sealing foam in holes in the roof caused by animals. Again, the defendant did not tell S.H. he was going to charge her for the work. Later that day, the defendant presented S.H. with a bill for $9,800. S.H. had assumed the work would cost $500 to $1,000 and told the defendant she did not have the money. When S.H. offered to pay with a credit card, the defendant said he did not take credit cards but agreed to take $800 off the bill. S.H. gave the defendant a check for $4,500 and asked him to wait 24 hours to cash it so

26

she could transfer funds.  The defendant told S.H. he would need the other $4,500 at the beginning of the coming month.  The defendant cashed the first check within 30 minutes of leaving S.H.'s home.  S.H. felt uncomfortable after the defendant left and tried to stop payment on the check, but it was too late.  An examination of S.H.'s roof found no new roofing or sealing work had been done on the roof.  The only evidence of recent work was some type of metallic spray had been applied to the chimney grates and their mortar bed.

*Incident 3:*  A.M. was born in 1924 and has difficulty seeing and hearing.  In September 2020, the defendant went to A.M.'s house and offered to repair her driveway.  A.M. paid the defendant $2,700.  The defendant then offered to do additional work, for which A.M. agreed to pay the defendant $88.  Because A.M. has difficulty seeing, she gave the checkbook to the defendant so he could write the check himself.  When the defendant went to the bank to try to cash the checks, the second of which was for $8,800—not $88.00—the teller called A.M. to confirm the check amounts were correct.  A.M. had trouble hearing and said the amounts were correct.  The teller cashed the checks.  A.M. discovered the check was for $8,800 instead of $88 after defendant cashed it.  A.M.'s friend, J.K., called the defendant for her and the defendant agreed to correct the mistake.  They never heard from the defendant again.  When an employee of the Lake County Sheriff called the number J.K. had used to reach the defendant, a woman answered and said she had never heard of the defendant.

*Incident 4:*  V.R. was born in 1929 and lived alone.  In August 2021, the defendant came to her home.  The defendant became emotional and said his father was dying, and that he was having trouble carrying on the contracting business he had inherited from his father.  The defendant stated he noticed V.R.'s house could use some repairs, and he claimed his father had previously worked on V.R.'s house.  The defendant's father, Bennie Wayne Johnson, had never worked on V.R.'s house.  The defendant convinced V.R. to pay him $1,600 to resurface her driveway, and then he told her she had issues

27

with the shingles on her roof.  The defendant and two other people, including his girlfriend Elesia Kay Faill, then sprayed an unknown substance on V.R.'s roof.  The defendant gave V.R. an invoice for $8,160 for the roof work.  V.R. was surprised by the amount, but the defendant told her he had only charged her for costs and her insurance would cover the rest.  V.R. wrote him a check for the $8,160.  At some other point, V.R. also wrote the defendant a check for $375.  The Humboldt County Sheriff's deputy who responded to V.R.'s report inspected her roof.  The deputy reported he only saw an old roof in poor condition, and he could not tell that any work had been done for the $8,160.

*Incident* 5:  P.P. was born in June 1954.  Her husband G.S. was born in 1963.  The defendant approached P.P. while she was in her driveway and offered to do work on the driveway for $800.  The defendant worked on the driveway for about one-and-one-half hours.  P.P. was home but G.S. was not.  After the one-and-one-half-hours, Elesia Kay Faill knocked on the door and handed P.P. an invoice for $6,000.  P.P. agreed to pay $4,000 then and $2,000 later.  The defendant cashed the $4,000 check soon after P.P. provided it.  After the defendant and Faill left, P.P. and G.S. discovered defendant had not seal coated the driveway but had just painted it black which damaged the asphalt.  The defendant and Faill also damaged another section of new asphalt a different contractor had laid for $1,000 by parking their truck on it.   When the defendant and Faill knocked on the door to collect the remaining $2,000, the defendant stayed in the truck while Faill went to the door.  When G.S. made a reference to law enforcement, the defendant and Faill left.

### 3.　　Arguments and Limiting Instructions

The trial court provided the jury with a limiting instruction regarding the prior-bad-acts evidence.  Under the instruction, the jury was only to consider the evidence if the People had proved by a preponderance of the evidence that the defendant had, in fact, committed the uncharged offenses.  If the People had met that threshold burden, the trial

28

court told the jury it could then only consider it for the limited purpose of deciding if the defendant was, in fact, the person who committed the crimes in this action; or that the defendant acted with the intent to commit theft in this case; or that the defendant had a motive to commit the offenses in this case; or that the defendant's acts were not a mistake or an accident; or that the defendant had a plan or scheme to commit the offenses in this case.

The trial court instructed the jury that in evaluating the evidence, it should consider the similarity between the uncharged offenses and the offenses alleged in the action. The trial court also instructed the jury that beyond the enumerated list of reasons, the jury could not use the evidence for any other reason except to determine the defendant's credibility. The trial court instructed the jury that if the jury concluded that the defendant committed the uncharged offenses, "that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the charged offenses. The People must still prove each charge beyond a reasonable doubt."

The People read the stipulations describing the five prior incidents to the jury during their opening statement and referenced the facts in them during the closing argument.

In closing, the defense argued, "What's the evidence in this case? That he does crappy work and he charges too much money for it. Doesn't make him a criminal, makes him a bad businessman that you wouldn't refer to your friend. [¶] Doesn't make him a burglar. Doesn't make him an extorter. Doesn't make him a thief."

B.    Underlying Statutes and Standards of Review

Evidence Code section 1101 governs the admissibility of uncharged crimes. Evidence Code section 1101, subdivision (a), generally prohibits the admission of "evidence of a person's character or a trait of his or her character," including in the form

29

of "specific instances of his or her conduct," when that evidence is "offered to prove his or her conduct on a specified occasion." "The provision 'expressly prohibits the use of an uncharged offense if the only theory of relevance is that the accused has a propensity (or disposition) to commit the crime charged and that this propensity is circumstantial proof that the accused behaved accordingly on the occasion of the charged offense.' (*People v. Thompson* (1980) 27 Cal.3d 303, 316, [].)" (*People v. Chhoun* (2021) 11 Cal.5th 1, 25 (*Chhoun*).)

However, Evidence Code section 1101, subdivision (b), states that this limitation does not prohibit, "the admission of evidence that a person committed a crime . . . when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ." (See also *Chhoun*, *supra*, 11 Cal.5th at p. 25 [" 'If an uncharged act is relevant to prove some fact other than propensity,' such as the perpetrator's intent or identity, or the existence of a common plan, 'the evidence is admissible, subject to a limiting instruction upon request.' (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 406)"].)

Here, the defendant does not argue that the prior act evidence was not admissible under Evidence Code section 1101, subdivision (b). However, when "evidence of the uncharged conduct is sufficiently similar to the charged crimes to be relevant for a nonpropensity purpose, the trial court must" also determine "the evidence's probative value is 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury' " under Evidence Code section 352. (*Chhoun*, *supra*, 11 Cal.5th at p. 26.) The defendant argues the prior-bad-acts evidence at issue here was "extremely prejudicial" and, therefore, fails to satisfy Evidence Code section 352's standards for admissibility. The defendant argues that the evidence is, in fact, so prejudicial that its inclusion violated his rights under the Fifth, Sixth, and Fourteenth Amendments of the U.S. Constitution and article 1, section 15 of the California Constitution.

We review a trial court's ruling on the admission or exclusion of evidence under Evidence Code sections 1101 and 352 for an abuse of discretion. (*People v. Johnson* (2022) 12 Cal.5th 544, 610 (*Johnson*).) Under this standard, " '[t]he court's ruling will not be disturbed unless made "in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' ([*People v. *]*Powell*[ (2018)] 6 Cal.5th [136], 162.)" (*Johnson*, *supra*, 12 Cal.5th at p. 611.)

### C.    Application

In considering the defendant's argument that the prior incident evidence ought to have been excluded under Evidence Code section 352 due to its prejudicial impact, we recognize the caution our Supreme Court provided in *People v. Thompson, supra,* 27 Cal.3d at page 318: "Since 'substantial prejudicial effect [is] inherent in [such] evidence,' uncharged offenses are admissible only if they have substantial probative value. If there is any doubt, the evidence should be excluded. (See *People v. Kelley* [ (1967)] 66 Cal.2d [232,] 239.)" (Fn. omitted; accord *People v. Ewoldt* (1994) 7 Cal.4th 380, 404, superseded by statute on other grounds as stated in *People v. Robertson* (2012) 208 Cal.App. 965, 991.)

The defendant argues that the "extensive" evidence presented of his uncharged prior offenses was "exceedingly prejudicial because it reinforced the prosecution's idea that appellant was a serial con man or fraudster rather than just an incompetent contractor who charged too much." In the next paragraph, he argues that the evidence was not necessary to show intent. Finally, the defendant argues the jury may have heard the evidence of these uncharged offenses and been prejudiced against him because they believed he had remained unpunished for these acts. None of these arguments are persuasive.

" ' " '[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not

31

to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.  In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' " ' (*People v. Powell*[*, supra,*]  6 Cal.5th [at pp.] 162-163 [].)" (*Johnson*, *supra*, 12 Cal.5th at p. 610.)  "Evidence is not unduly prejudicial 'merely because it strongly implicates a defendant and casts him or her in a bad light.' (*People v. Robinson* (2005) 37 Cal.4th 592, 632[].)" (*People v. Lindberg* (2008) 45 Cal.4th 1, 50.)

Here, the prior acts evidence was highly probative in demonstrating the defendant's intent:  contrary to his argument that he is simply bad at his job, he has a history of charging elderly "customers" for work either not performed or poorly performed.  This history reflects that when he charged the victims in this case, he had an understanding that he was not actually providing anything of value in exchange for payment and he *intended* to defraud them which goes to directly counter defendant's argued defense.

The evidence presented regarding the prior bad acts were unlikely to inflame the jury more than the facts of the crimes at issue here.  While one victim in this case testified how behavior by the defendant caused her to be afraid, and another described him as becoming angry and engaging in what she saw as wild behavior, none of the stipulations regarding the prior bad acts contain evidence that the targets of the defendant's schemes perceived him as angry or threatening.  At worst, one of the complainants of his prior acts had reported she felt uncomfortable after he did work at her property, which more likely was a reference to suspecting she had been defrauded of money than a reference to how defendant had made her feel when he was around her.  Though "the prejudicial effect of the evidence is increased if the uncharged acts did not result in a criminal conviction . . . [t]he potential for prejudice is decreased . . . when testimony describing the defendant's uncharged acts is no stronger or more inflammatory

32

than the testimony concerning the charged offense." (*People v. Tran* (2011) 51 Cal.4th 1040, 1047.)

Additionally, the trial court's treatment of the prior incident evidence, far from showing an abuse of discretion, shows the court engaged in a careful balancing of the potential impact of the evidence. To wit, it limited the incidents that could be offered to the jury for consideration to the most recent incidents. This reflected an understanding that the probative value of the more recent incidents would be greater, because "[t]he close proximity in time of the uncharged offenses to the charged offenses increases the probative value of this evidence." (*People v. Balcom* (1994) 7 Cal.4th 414, 427.)

The trial court also included an appropriate limiting instruction regarding the use of the prior acts evidence. Though the defendant may wish we would assume the jury ignored this instruction, " '[w]e presume the jury understood and followed the instruction' (*People v. Homick* (2012) 55 Cal.4th 816, 873[].)" (*People v. Sanchez* (2019) 7 Cal.5th 14, 55.)

On this record, the trial court did not abuse its discretion when it declined to exclude the prior acts evidence under Evidence Code section 352.

Because the trial court "did not abuse its discretion under state law, defendant's constitutional claims also fail. (*People v. Fuiava* (2012) 53 Cal.4th 622, 670 [].)" (*Chhoun*, *supra*, 11 Cal.5th at p. 26.)

III

*Section 667.5, Subdivision (c)(21), Person-Present Findings*

The defendant argues the trial court abused its discretion when it denied his request to strike the section 667.5, subdivision (c)(21), enhancements to the defendant's convictions for the first-degree burglary of M.B., I.B. and J.B., and J.H. The court did not abuse its discretion.

### A. Statutory Overview and Standard of Review

Section 667.5, subdivision (c)(21), specifies that a first-degree burglary, "wherein it is charged and proved that another person, other than an accomplice, was present in the residence during the commission of the burglary," is a violent felony. As relevant here, "[u]nder section 2933.1, if the defendant is convicted of a violent felony listed in section 667.5, subdivision (c) and is sentenced to state prison, both pre-sentence and post-sentence conduct credits are limited to 15 percent." (*People v. Valenti* (2016) 243 Cal.App.4th 1140, 1184, superseded in part by statute on other grounds as stated in *People v. Brooks* (2018) 23 Cal.App.5th 932, 946, fn. 17, review granted Aug. 29, 2018, S249617.)

Trial courts have the authority to strike enhancement findings or an additional punishment due to an enhancement finding "in furtherance of justice," under section 1385, subdivisions (a) and (b). (See also *Nazir v. Superior Court* (2022) 79 Cal.App.5th 478, 490-491 (*Nazir*).)

"In general, we review for abuse of discretion the trial court's decision not to strike a sentence enhancement under section 1385, subdivision (a)." (*People v. Mendoza* (2023) 88 Cal.App.5th 287, 298.) "A trial court may abuse its discretion where 'its decision is so irrational or arbitrary that no reasonable person could agree with it,' 'where the trial court was not "aware of its discretion" ' to dismiss a sentencing allegation under section 1385, or 'where the court considered impermissible factors in declining to dismiss.' ([*People v.* ]*Carmony*[ (2004) 33 Cal.4th 367,] 377, 378; see *People v. Tirado* (2022) 12 Cal.5th 688, 694 [] [a 'court acting while unaware of the scope of its discretion is understood to have abused it']; *People v. Pearson* (2013) 56 Cal.4th 393, 419 [] [a court abuses its discretion when it misunderstands the scope of that discretion].) [¶] 'Because "all discretionary authority is contextual" [citation], we cannot determine whether a trial court has acted irrationally or arbitrarily in refusing to strike a [sentencing]

34

allegation without considering the legal principles and policies that should have guided the court's actions.' (*People v. Carmony*, *supra*, 33 Cal.4th at p. 377.)" (*Nazir*, *supra*, 79 Cal.App.5th at p. 490.)

B.    <u>Analysis</u>

Here, the defendant makes three arguments in support of his position that the trial court abused its discretion. We disagree with each.

First, he argues that there was no actual violence, or even a potential for violence, in the three burglaries at issue here. He suggests that the burglaries here were not "typical" burglaries, where a person breaks and enters a dwelling and there is an attendant risk that a resident will grab a weapon. He argues he was unarmed, that the offenses occurred in broad daylight, and that he never physically threatened anyone.

The inclusion of "occupied burglary" on the list of violent felonies contained in section 667.5, subdivision (c), demonstrates a legislative understanding that the crime presents a potential and increased risk for violence which "justifies increasing the offender's sentence" even if "it does not necessarily imply the offender will be predisposed to commit acts of violence." (See *Doe v. Saenz* (2006) 140 Cal.App.4th 960, 988.) Courts have found a section 667.5, subdivision (c)(21), enhancement " 'does not require the use or threat of force. Indeed, the crime does not require any contact between the defendant and the occupant. The mere presence of a nonaccomplice in the dwelling is sufficient. Further, knowledge that a dwelling is occupied is not an element of occupied burglary. Thus, a burglary may qualify as an occupied burglary under . . . section 667.5[, subdivision ](c)(21) even though the defendant had no contact with the occupant and thought no one was present in the home during the burglary.' (*Doe v. Saenz*, *supra*, at p. 987.)" (*People v. Munguia* (2016) 7 Cal.App.5th 103, 110.)

While the burglaries at issue here may not have been what he sees as "typical," contrary to the defendant's argument, they were not devoid of the potential for violence. Specifically, J.E. testified he had his grandfather, J.H., write a check to the defendant

35

because he did not want to cause a confrontation, and J.E. believed he and J.H. were in no position to defend themselves if the situation escalated. Moreover, the trial court found that the victims of defendant's crimes were particularly vulnerable. Additionally, the testimony of other witnesses gave credence to J.E.'s concerns. One witness testified that in one interaction, the defendant got very angry and "was kind of wild" and raised his voice and started gesticulating in the driveway. Though she stated she was not necessarily afraid when this happened, she was concerned about his behavior. Later she parked her car in front of her gate so defendant and those who appeared to be with him could not get back through her gate. A few days later she put a metal chain and padlock on the gate.

Another witness testified to defendant repeatedly showing up at her gate and angrily waving his arms around as part of his efforts to extract a payment from her and her husband. The witness testified to being traumatized by the defendant's behavior and how his behavior contributed to the decision of her and her husband to eventually install a security camera at the gate. In this context, the trial court could have reasonably concluded the presence of the victims in their residences during the burglaries presented the potential for violence that which supports the trial court's decision here.

Second, the defendant argues that section 2933.1 was designed to protect the public from dangerous repeat offenders, and that purpose is sufficiently addressed by the lengthy prison sentence of "at least a decade" that the defendant would serve even if the section 667.5, subdivision (c)(21), enhancements were struck.

Third, the defendant argues that even if he needs rehabilitation, that need can be met with a prison sentence of 10 or more years.

Neither the second nor third argument is an argument that meets the standard for demonstrating an abuse of discretion. They are simply arguments that it would not have been unreasonable if the court had made a different ruling. Yet it was neither irrational nor arbitrary for the trial court to make a ruling that suggested it had concluded the aims

36

of section 2933.1 and rehabilitation could be better served if the enhancement findings, and thus the longer required sentence, remained in place.  (See *Nazir*, *supra*, 79 Cal.App.5th at p. 490.)  Additionally, in raising these arguments, the defendant makes no suggestion that the trial court considered factors it could not in declining to strike the findings, and the decision does not lend itself to the conclusion that the trial court was unaware of its discretion.  (See *ibid.*)

IV

*Corrections to Sentencing Errors*

We asked the parties to provide supplemental briefing regarding how this court should remedy errors the trial court made when it sentenced the defendant on counts 48 and 45.  The defendant argues that we must remand this matter to the trial court so that it can exercise its discretion and resentence the defendant on the two misidentified counts.  The People counter we can simply correct the error on appeal because these errors were clearly clerical in nature.

"It is well established that a sentence which is the result of clerical error (in the sense of inadvertence, though committed by the judge) may be corrected at any time, by the trial court or the reviewing court."  (*People v. Menius* (1994) 25 Cal.App.4th 1290, 1294-1295.)  Here, the sentencing errors were clearly inadvertent errors born of a sentencing judge having to wade through a long list of convictions while announcing the sentence.  Moreover, the consistency with which the judge applied specific sentences to specific guilt findings makes it easy to determine what sentence the trial court would have imposed had it not misspoken.

With respect to count 48, on which the jury convicted the defendant of grand theft of an elder, while the court may have misidentified the underlying offense as a violation of section 484b, the court imposed the same sentence—an unstayed one-year consecutive sentence—that it had for the remaining four counts of grand theft from an elder when

there was no finding of guilt for a greater crime stemming from the same acts. In contrast, the trial court imposed and stayed eight-month sentences for the section 484b convictions it correctly identified during sentencing. In short, with count 48, the trial court appears to have misspoken when it identified the underlying crime, but it sentenced the defendant as if it had labeled the count correctly during sentencing. All that needs to be done to correct this is to amend the judgment and abstract to clarify the sentence is for a section 368, subdivision (d) (grand theft from an elder) conviction.

With Count 45 determining what the trial court would have done but for the inadvertent error made during sentencing takes an additional step, but we are no less certain what the result would have been. With count 45, the jury found the defendant guilty of misappropriating construction funds over $2,350 under section 484b. During sentencing, the trial court (1) erroneously labeled the count as a grand theft violation under section 487, subdivision (a), *and* (2) applied a sentence for the count as if the count was a grand theft count. That is, the court imposed a sentence of one-year and stayed it under section 654, where, on all the other convictions for misappropriation of construction funds over $2,350, the court imposed and stayed eight-month convictions. We note that with the remaining section 484b offenses, the defendant was convicted of and sentenced to serve unstayed time for either grand theft from an elder (§ 368, subd. (d)) or first-degree burglary (§ 459, subd. (a)) due to the same actions.

In contrast, here the same actions resulted in a conviction of an unstayed sentence for grand theft (§ 487, subd. (a), i.e., not of an elder). However, the trial court's pattern of imposing and staying an eight-month sentence for the section 484b convictions leaves us with no doubt that, but for the clerical error, the trial court meant to do the same thing here.

We observe that the net result of us correcting these errors is that (1) the defendant's unstayed sentence remains unchanged; and (2) the total stayed sentence is reduced by only four months.

DISPOSITION

We affirm the trial court's guilt findings. We remand in part with instructions to the trial court to correct the clerical errors addressed in this opinion that it made in sentencing the defendant and correcting the abstract of judgment accordingly. The judgment should reflect that on count 45, the defendant is being sentenced for violating section 484b by misappropriating construction funds over $2,350, and the sentence for that count is eight months, stayed under section 654. The judgment on count 48 should reflect that the defendant is being sentence to an unstayed term of one year for the grand theft of an elder conviction under section 368, subdivision (d).

_____

HULL, J.

We concur:

_____

EARL, P. J.

_____

ROBIE, J.